**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**WILLIAM BRODY,**                                        :
                                                          :
                    **Plaintiff,**              :
                                                          :   **00 Civ. 7481 (HB)**
  - against -                                      :
                                                          :
                                                          :   **DECISION AND**
                                                          :   **ORDER**
**VILLAGE OF PORT CHESTER,** *et. al.*,                    :
                                                          :
                    **Defendants.**            :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      Plaintiff William Brody ("Plaintiff" or "Brody"), in this long-running litigation to challenge the taking of his property, brings, pursuant to his Amended Complaint of August 28, 2006, constitutional claims against Defendants Village of Port Chester (the "Village"), G&S Port Chester LLC ("G&S"), Village of Port Chester Industrial Development Agency ("Village IDA"), and Hudson United Bank Co. ("Hudson") (collectively, "Defendants"). Brody's remaining claims allege, pursuant to 42 U.S.C. § 1983, violations of procedural due process by Defendants relating to the condemnation of his property by the Village under N.Y. E.D.P.L. § 201 *et. seq.*

      Upon remand from the Second Circuit, see Brody v. Village of Port Chester, 434 F.3d 121, 124 (2d Cir. 2005) ("Brody III"), I held a bench trial on March 19, 20, and 29, 2007 to determine whether Defendants violated Brody's rights to due process, in light of whether Brody received "actual notice" that might obviate any due process violation. Further proceedings will be held in accordance with this Opinion.

## I.  FINDINGS OF FACT

A.  Environmental Review Process

      In 1996, Plaintiff William Brody purchased commercial property in an area of the Village of Port Chester that had long been slated for redevelopment. See generally Brody III, 434 F.3d 121, 124.

1

In 1998, according to Brody, he heard that the property might be part of another proposed redevelopment plan. Stanley Perelman and Gregg Wasser of G&S Port Chester, LLC, met with Brody at some point in 1998 and told him that G&S wanted to buy his property in an arms-length transaction without the use of eminent domain.[1] See Declaration of Stanley Perelman, Mar. 7, 2007 ¶ 29 ("Perelman Decl."); Declaration of Gregg Wasser, Mar. 9, 2007 ("Wasser Decl.") ¶¶ 44-45; Declaration of William Brody, Mar. 9, 2007 ("Brody Decl.") ¶ 12; Trial Transcript ("Tr.") 214:2-214:6; 215:13-216:2.

Brody avers that subsequently, in late 1998 or early 1999, he went to the Greenwich library to research eminent domain law. See Brody Decl. ¶ 11. Brody avers that the information he found was "very general" and "didn't tell [him] how to fight the condemnation."[2] Id.

On November 18, 1998, the Village published and made available for public review and comment a Supplemental Draft Environmental Impact Statement ("Draft EIS"), pursuant to the New York State Environmental Quality Review Act, which requires local governments to prepare an environmental impact statement for any proposed action that may have an effect on the environment. See N.Y. ENVTL. CONSERV. § 8-0109(2) (2007). The Village, in Section 2.3.8 of that Draft EIS, summarized (albeit not entirely correctly) the then-operative sections of New York Eminent Domain Procedure Law relevant to a potential challenge to a taking of property. The Village's summary read as follows:

> "The EDPL requires the condemnor to review the public purpose of a proposed condemnation at a public hearing held at least ten (10) but no more than thirty (30) days prior notice by publication. At the hearing, the condemnor must outline the purpose and proposed location or alternate locations of the public project.
>
> "The hearing may be adjourned without limit from time to time. Within ninety (90) days after the close of the hearing the condemnor must issue its determination and findings, which must minimally specify (a) the

---

[1] Perelman testified that this meeting with Brody took place in or around June 1998. See Perelman Decl. ¶ 29. Brody testified that the meeting took place in or around December 1998. Brody Decl. ¶ 12.

Perelman stated that whenever he met with property owners, he generally "explained to them how condemnation works and specifically told them to seek the advice of legal counsel." Perelman Decl. ¶ 28. Perelman testified, however, that he generally did not indicate to owners "that there was a way they could challenge the public purpose of the condemnation of their property." Tr. 102:15-20.

[2] Brody states, "I think I looked up definitions in the dictionary or something like that and I also found something about a Port Chester grant." Brody Decl. ¶ 11.

public purpose of the project, (b) the location of the project and the reasons for selection of that location and (c) the general impact of the project on the environment and residents of the locality.

"The determination and findings are reviewable by the Appellate Division in an Article 78 proceeding commenced within thirty (30) days after the completion of the publication of the determinations."

See Def. Ex. JJ, MM.

As Brody points out, the Village incorrectly stated that the Determination and Findings are reviewable in an Article 78 proceeding. Rather, the Determination and Findings are exclusively reviewable in a special proceeding pursuant to N.Y. E.D.P.L. § 207.[3] That error aside, the Village more or less stated the applicable procedural requirements of E.D.P.L. § 207 correctly. An E.D.P.L. § 207 proceeding must, in fact, be brought in the Appellate Division. See N.Y. E.D.P.L. § 207(B). The time limit for such an EDPL proceeding is, in fact, 30 days. See N.Y. E.D.P.L. § 207(A).

Conversely, however, the period to seek Article 78 review is 120 days, not 30. Also, Article 78 relief is sought in the Supreme Court, not the Appellate Division. N.Y. C.P.L.R. §§ 217, 7804.[4]

The Draft EIS also attached an Appendix of relevant verbatim provisions of the N.Y. E.D.P.L. Strangely, the Draft EIS omitted N.Y. E.D.P.L. §§ 207 and 208, the sections which provide for judicial review of takings. See Def. Ex. JJ.

In any case, Brody submitted a letter of comment in response to the Draft EIS, dated January 11, 1999, in which he stated, inter alia, "In 1875, it became clear that government could take land through eminent domain for public use," and asked, "[D]oes

---

[3] See N.Y. E.D.P.L. § 207(A) ("Any person… aggrieved by the condemnor's determination and findings… may seek judicial review thereof by the appellate division of the supreme court…"); § 207(B) ("The jurisdiction of the appellate division of the supreme court shall be exclusive and its judgment and order shall be final subject to review by the court of appeals in the same manner and form and with the same effect as provided for appeals in a special proceeding.").

[4] Defendants argue that if Brody had sought to challenge the taking in the form of an Article 78 proceeding, the court would have converted the case into its proper form, pursuant to N.Y. C.P.L.R. 103(c). The Second Circuit, ruling on a related issue, has cast doubt on this argument. See Brody II, 345 F.3d 103, 115-16 (2d Cir. 2003) (N.Y. C.P.L.R. 103(c) did not provide jurisdiction to bring Article 2 claims pursuant to EDPL in Article 4 proceeding, because the specific grant of jurisdiction in the EDPL trumped any general grant of jurisdiction in CPLR 103(c)).

In any event, it is undisputed that Brody never brought any sort of action challenging the constitutionality of the Determination and Findings.

3

this seizure violate my rights under the state constitution…"  See Def. Ex. QQ, Pl. Ex. 6, Tr. 218:17-219:3, 230:21-231:2.

In March 1999, the Village published and made available for public review and inspection a Supplemental Final Environmental Impact Statement ("Final EIS").  See Def. Ex. RR; see also Pre-Trial Order, Stipulations, Mar. 9, 2007 ("Stipulations") ¶ 15. The Final EIS repeated the partially incorrect statements made in Section 2.3.8 of the Draft EIS regarding a challenge to a Determination and Findings under New York eminent domain law.  See Def. Ex. RR.  The Final EIS also incorporated by reference the Appendix of the Draft EIS that included verbatim sections of the N.Y. E.D.P.L.  See id. The Final EIS also specifically responded to Brody's comment letter, stating generally that the "redevelopment of a designated urban renewal area is a public purpose," but did not, in that response, address procedures to challenge the taking.  See id.

    B.  Garrison Corwin's Representation of Plaintiff Brody

Brody hired Garrison Corwin, Esq. to represent him in the environmental review process (or as Brody put it, to "get him out of the Project").  Brody Decl. ¶ 15; Tr. 164:11-164:21; Tr. 237:8-237:9.  Corwin testified that the scope of his representation of Brody did not extend to the issue of eminent domain.  Tr. 170:7-11; 171:16-19.  Brody read several articles and faxed them to Corwin, including an article that mentioned the possibility of the Village condemning land for the Project.  See Def. Ex. SS; Tr. 237:11-239:4.  Brody, however, testified that he never discussed condemnation with Corwin.  Tr. 272:15-19; 273:9-17.  Corwin, for his part, testified that he was aware that "there might be a condemnation at some point," but that he "was not aware… when it was going to be starting," and that he "had nothing to do with it."  Tr. 170:9-11.

Corwin reviewed the Final EIS and the Draft EIS, and specifically reviewed the portion of the Final EIS that summarized (albeit, as noted, not entirely correctly) the then-operative section of the New York EDPL, and stated therein that the Determination and Findings were reviewable in a proceeding commenced within 30 days.  Tr. 157:21-158:21; Tr. 162:22-163:20; Def. Ex. UU.  Corwin testified that he did not discuss that section with Brody, nor did Brody ask him about it.  Tr. 165:7-10, 171:9-15.

On March 18, 1999, Corwin and Brody attended the Village's public hearing regarding the Final EIS, at which Corwin spoke on Brody's behalf.  Stipulations ¶ 18.  At

4

the March 18, 1999 hearing, as the transcript shows, neither the EDPL, the date of issuance of the determination and findings, nor the attendant 30-day review period was discussed.  Def. Ex. UU.

Corwin subsequently sent a one-page letter to Brody on March 19, 1999, outlining his possible legal options regarding the environmental review process.  Def. Ex. VV; Tr. 168:7.  Corwin recommended that Brody take "no specific action until we have the actual approval resolution in connection with the [Final EIS]," and that Corwin would meet with Michael Zarin, the Village's special counsel regarding the urban renewal proceedings, to "discuss the situation, generally."  Def. Ex. VV.  Shortly after Corwin sent Brody that letter, Brody told Corwin by telephone that he would have no further need of Corwin's legal services.  Tr. 168:12-25.

       C.  First Public Use Hearing – June 7, 1999

On May 22, 1999, the Village published notice of a public hearing to be held on June 7, 1999 regarding the public use of the redevelopment project.  Pl. Ex. 9.  The hearing notice stated the time, place, and subject matter of the hearings, listed Brody's property by its lot numbers, and cited to Article 2 of the EDPL (albeit not EDPL § 207 specifically).  Id.  Prior to that notice, the Village sent Brody a notice of the hearing by certified mail, which Brody's wife signed for.  Stipulations ¶ 20.  Brody avers that he does not recall receiving that notice.  Brody Decl. ¶¶ 18.

Brody nevertheless heard about the June 7, 1999 hearing, attended, and spoke for four minutes.  Brody Decl. ¶¶ 17; see Def. Ex. AAA.  During his four minutes, Brody stated that he "wanted to touch on eminent domain," and referred to "potential threats… of litigation which I'm sure none of us really want."  Def. Ex. AAA.  Brody testified at trial that although at this point in time he was nervous about eminent domain, he had not consulted with an attorney or done additional research on the issue of eminent domain. Tr. 244:25-245:8.

Brody generally avers that he thought this June 7, 1999 hearing was "just an intermediate step" and that "anything that happened would happen much later."  Brody Aff. ¶ 21-22.  At the hearing, Michael Zarin, the Village's counsel, stated that the eminent domain proceedings would be an "ongoing process," that the Village would be "keeping you all abreast of the procedure as it goes forward," and that "no one here is

5

going to be subject to the eminent domain procedure or have a condemnation in the immediate future." Pl. Ex. 10, at 11.[5] At this hearing, the Village did not tell participants that the hearing would result in a "determination and findings," nor that following the determination and findings interested parties would have a 30-day period to initiate a challenge to them.  See Pl. Ex. 10.

   D.  Second Public Use Hearing – July 6, 1999

Shortly after the June 7, 1999 hearing, the Village published notice of a second public use hearing in the local newspaper that again listed Brody's property by its lot numbers.  See Def. Exs. BBB, GGGG; Pl. Ex. 12.  The notice stated that the Village would hold a "public hearing… to review the public use to be served" by the Project.  Pl. Ex. 12. The notice further stated that the hearing would "review the impacts on residents which may result from the condemnation by the Village of private properties within the project area," and listed the affected properties (including Brody's).  Id.

This second public use hearing was held on July 6, 1999.  See Zarin Decl. ¶ 30-32.  Brody avers that he did not receive notice of this hearing, as he did not look in the newspaper for legal notices.  Brody Decl. ¶ 28-29; Tr. 250:4-6.  Brody avers, and it appears, that notice was not mailed to him.  Brody Decl. ¶ 28.  It is undisputed that Brody did not attend the hearing.  Brody Decl. ¶ 29.  Brody testified that he would have attended the meeting if he had known about it.  Tr. 250:23-251:1; Brody Decl. ¶ 29.[6]  In any event,

---

[5] Zarin explained these statements in part by noting that "many of the land owners had attorneys," that some of the information had been included in the environmental impact statements, and that "he had found over the years that… the people that are… interested in a project often avail themselves of coming to town hall or to the library" to review those documents.  Tr. 185:8-10, 193:1-4.

[6] Brody avers in his Complaint that had he known about this hearing and "known its significance for his ability to challenge the future possible condemnation," he would have not only attended, but "hired an attorney," "made additional arguments," and "made sure to raise all his legal objections."  See Pl. Am. Compl. ¶ 40.

Generally, Brody avers that his (hypothetical) comments that he would have made at the meeting would have depended on what the Village told him at the hearing.  See Tr. 251:10-15 ("[I]f… they said… 'don't worry, nothing is going to happen for a long time,' I probably wouldn't have done anything.  If they said something else, making me think… something is going to happen right away, I would have reacted differently.").  However, at trial, Brody did not specify what statements he would have made.  See Tr. 251:16-252:3.  Brody did not specify what lawyer he would have hired, and admitted that he was not talking to lawyers at the time of this hearing.  See Tr. 252:9-253:16. Brody averred that he would have submitted information at the hearing regarding "the things that I felt with the project that weren't done correctly."  Tr. 253:21-24.  However, Brody admitted that he did not submit such information at the prior June hearing.  Tr. 253:25-254:1.  Brody also avers that he would have "organized a lot of the small business people, some of the local coalitions" and that "there could have been a lot of political pressure…

Brody's comments at the first hearing were included as part of the overall record of the July 6, 1999 hearing.  See Pl. Ex. 11.

### E. Publication of Determination and Findings

On July 14, 1999, a public meeting (which the Village avers, and Brody does not contest, was duly noticed by publication in the local newspaper) was held with respect to the redevelopment project.  See, e.g., Def. Ex. DDD.  At this meeting, the Village adopted its Determination and Findings regarding the project.  Id.

On July 15, 1999, the *Journal News* published an article entitled "Port Chester approves $120M downtown plan" that stated that "Village officials gave their final approval yesterday for a $120 million downtown redevelopment project…" Def. Ex. UUUU, Pl. Ex. 62.  On July 16, 1999, the *Westmore News* published a front-page article that stated that "the Village gave all its final approvals for the project."  Def. Ex. OOOO, Pl. Ex. 45.  Brody testified that he did not read these newspapers at this time, and thus did not see these articles.  Tr. 260:6-261:20.  Also on July 16, 1999, the *Soundshore Review* published a front-page article that was entitled, in part, "final approvals granted."  Pl. Ex. 99.[7]  None of the articles mentioned a 30-day challenge period.

On July 18, 21, and 22, 1999, the Village published in the local newspaper, the *Journal News*, a synopsis of the Determination and Findings.[8]  Def. Exs. FFF, HHHH, IIII; Stipulations ¶ 22.  The synopsis stated the public use of the project, and identified Brody's property by tax block and lot number.  Def. Exs. FFF, HHHH.  The synopsis did not state that its publication commenced the 30-day period to challenge a taking under the EDPL.  Def. Exs. FFF, HHHH; Stipulations ¶ 23.  Brody testified at trial that he did not see the published synopsis in the *Journal News* because he did not look.  Tr. 259:19-260:5.

---

[that] could have defeated this…"  Tr. 256:12-19.  Brody admitted, however, that he did not organize such opposition at any time prior to this hearing, despite the previous hearings that had been held.  Tr. 257:7-10.

[7] Brody testified generally that he only read the *Sound Shore Review* if it was "in the kitchen and hadn't been thrown out yet."  Tr. 247:18-21.  Brody did not directly testify at trial as to whether he read the July 16, 1999 article.  Tr. 261:21-22.

[8] On July 15 and 16, 1999, articles appeared in the local newspapers the *Journal News*, *Westmore News*, and *Soundshore Review* regarding the Village's "final approval" of the redevelopment plan.  See Def. Ex. OOOO, UUUU; Pl. Ex. 99.  Brody avers he did not see these articles, as he did not read those newspapers in 1999.  Tr. 247:13-249:2, 260:6-261:20.

7

The Village did not send Brody personal notice of the Determination and Findings.[9] Brody Decl. ¶ 32. Brody avers that he did not know the Determination and Findings existed, and would have challenged them if he knew he could have challenged them. Id. at ¶ 34. A review of published news articles from the local newspapers *Journal News*, *Westmore News*, and *Rye Record* between September 1, 1998 and August 31, 1999 shows that no articles mentioned the date on which the determination and findings was published, nor that a thirty-day challenge period commenced on that date. See Pl. Ex. 103.

 F. Stanley Perelman Conversation

In late July or early August 1999, Stanley Perelman, a principal of G&S Port Chester LLC, called Brody with respect to his property.[10] Tr. 108:22-109:11.

Perelman states that he explained to Brody that "G&S had received its approvals on July 14, 1999." Perelman Decl. ¶ 33. Perelman states that Brody asked him "if the appeals period had expired," and Perelman responded "no."[11] Id. Perelman stated that "we were generally talking about all the appeals for the project, not just condemnation… Tr. 115:3-4. Perelman did not recall telling Brody that the appeal period for the condemnation decision (or generally) was 30 days.[12] See Tr. 143:22-144:5 ("I can't recall saying it was 30 days… The fact was that it had not expired yet.").[13] Generally, Perelman stated that he "didn't tell [Brody] anything" about eminent domain procedures law. Tr. 145:4-7.

---

[9] In 1999, the New York EDPL did not require the Village to provide Brody with personal notice of the Determination and Findings. See Tr. 257:13-258:13. The Second Circuit subsequently found the EDPL, as it existed at that time, to be constitutionally deficient in this respect. See Brody III, 434 F.3d at 123. In 2004, the EDPL was amended to require that notice of the public hearing, and a synopsis of the Determination and Findings, be mailed to affected property owners. See Brody III at 124 n.1, citing EDPL § 202(c), 204(c).

[10] Perelman narrowed this time to "somewhere between the last week of July and the first week of August." Tr. 109:10-11.

[11] Brody avers that although he "[didn't] remember everything that was said in that conversation," he "couldn't have asked about appeals," as he "didn't know enough to ask that question." Brody Decl. ¶ 31.

[12] Perelman also testified that he generally did not tell property owners that they had "30 days… to go to court." See Tr. 148:14-24.

[13] Perelman testified that although he thought "everybody was aware" of the 30-day challenge period, "…I don't think that the village or G&S at the time put a big billboard sign in the middle of the village that said, 30 days ticking now, if you want to fight speak up." See Tr. 145:17-18, 146:16-23.

8

Brody, for his part, testified that although Perelman did not tell him that the Village had adopted its Determination and Findings, if he had, he wouldn't have thought anything of it, as Perelman was from G&S, not the Village. Tr. 263:1-7. Perelman avers that during this conversation, Brody said that he "didn't want to fight" and "wanted to reach an agreement… and go on with his life." Perelman Decl. ¶ 32; Tr. 114:19-22.

In any event, Brody did not challenge the Determination and Findings within the required thirty-day period, thus losing his rights to challenge the condemnation of his property on constitutional or statutory grounds. Brody Decl. ¶¶ 32-35; see N.Y. E.D.P.L. § 207.

### G. State Court Proceedings

On April 25, 2000, the Village filed a petition in state court pursuant to N.Y. E.D.P.L. § 402 to acquire title to the redevelopment project area, including Brody's property. Brody III, 434 F.3d at 125. Brody contacted new counsel, Charles McGroddy, to oppose the use of eminent domain. See Brody Decl.¶¶ 40-42; McGroddy Decl. ¶ 5. McGroddy correctly informed Brody that he had lost the opportunity to challenge the taking on constitutional grounds, because the 30-day window to do so had already closed.[14] Brody Decl. ¶ 42; McGroddy Decl. ¶ 8-9; Pl. Ex. 21. On May 17, 2000, Brody, through his counsel McGroddy, challenged the petition and interposed several affirmative defenses. His defenses related exclusively to compensation. McGroddy Decl. ¶ 6.

Eventually, on January 24, 2006, New York state Supreme Court awarded Brody $2.57 million as just compensation for the taking of his property, pursuant to Article 5 of the EDPL. See In the Matter of the Village of Port Chester, No. 006448/00 (N.Y. Sup. Ct. Jan. 26, 2006) (Rosato, J.). Brody has appealed that order. His appeal remains pending.

### H. Federal Court Proceedings

On October 4, 2000, Brody (joined by other Port Chester property owners) commenced a lawsuit in this Court that challenged the Village's taking of his property on constitutional grounds. Brody alleged that the notice of the taking that the Village

---

[14] "Except as expressly set forth in section two hundred seven… no court of this state shall have jurisdiction to hear and determine any matter, case or controversy concerning any matter which was or could have been determined in a proceeding under this article." N.Y. E.D.P.L. § 208.

9

provided was constitutionally insufficient to satisfy procedural due process. Several years of litigation followed, which is summarized in prior opinions.

On December 5, 2005, the Second Circuit held that the process afforded by the Village to Brody regarding its Determination and Findings was indeed constitutionally inadequate. Brody III, 434 F.3d 121, 123 (2d Cir. 2005). The Second Circuit held that due process required the Village to provide personal notice (such as a letter by mail), where practicable, of the commencement of the exclusive thirty-day challenge period.[15] See Brody III, 434 F.3d 121, 128, 132 ("[W]here, as here, a condemnor provides an exclusive procedure for challenging a public use determination, it must also provide notice in accordance with the rule established by *Mullane* and its progeny…. '[R]easonable notice' under these circumstances must include mention of the commencement of the thirty-day challenge period.)[16] It is undisputed that the Village did not provide such personal notice, such as a letter by mail, to Brody of the publication of the Determination and Findings.[17] The Second Circuit thus remanded Brody's case to this Court for a determination of whether Brody received "actual notice" of the Determination and Findings, as well as Brody's resultant damages, if any, from any due process violation. Brody III at 124.

On August 30, 2006, Brody filed an Amended Complaint in this Court. Brody re-alleged his due process claim.[18] See First Amended Complaint, August 30, 2006 ("Am. Compl.") at ¶¶ 68-75. Brody also alleged additional facts designed to remedy his lack of standing to challenge the constitutional sufficiency of his notice of the two public hearings held on June 7 and July 6, 1999. See Am. Compl. ¶¶ 39-41.[19]

---

[15] "Where the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency." Brody III at 129, citing Mullane v. Cent. Hanover Bank & Trust, 339 U.S. 306, 318 (1950). "This rule has been applied in condemnation compensation proceedings to require individualized notice by mail; [Citations] …we see no reason why the rule should not apply here." Brody III at 129 (citations omitted).

[16] The Second Circuit noted, however, that "beyond that, property owners are generally charged with knowledge of the laws relating to property ownership." Brody III at 132, citing North Laramie Land Co. v. Hoffman, 268 U.S. 276, 283 (1925).

[17] "Personal notice," as the term is used here (e.g., the provision of notice by mail, rather than by publication), is distinct from the concept of "actual notice" (i.e., the actual receipt of notice by the intended recipient). See note 22, infra.

[18] Brody also asserted an equal protection claim. See Am. Compl. ¶ 77.

[19] On January 17, 2001, upon Brody's application for injunctive relief, I found that Brody was likely to show that he possessed standing to challenge his lack of notice of the July 6 hearing and the lack of notice

On January 23, 2007, I bifurcated trial of this matter into two phases – a determination of whether Brody received "actual notice," to be followed by a determination of Brody's resultant damages, if any, from any due process violation. See Brody v. Port Chester, 2007 U.S. Dist. Lexis 15746, at *3 n. 1 (S.D.N.Y. Mar. 7, 2007).

On March 7, 2007, upon Defendants' Rule 12(c) motion, I held that Brody still lacked standing to challenge his notice of the first June 7, 1999 hearing, but now possessed standing to challenge the notice of the second July 6, 1999 hearing. See Brody v. Port Chester, 2007 U.S. Dist. Lexis 15746, at *21-25.[20]  On March 12, 2007, I denied Brody's motion for partial summary judgment on his due process claim for lack of constitutionally adequate notice of the Determination and Findings. See Brody v. Port Chester, 2007 U.S. Dist. Lexis 16993 (S.D.N.Y. Mar. 12, 2007).

On March 19, 20, and 29, 2007, I conducted a bench trial to determine whether Brody received "actual notice," and consequently, whether due process violations existed.  The parties submitted post-trial memoranda on April 18, 2007.

## II.     CONCLUSIONS OF LAW

Due process requires that a deprivation of property be preceded by notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." Brody III at 127, citing Mullane v. Cent. Hanover Bank & Trust, 339 U.S. 306, 314 (1950).  However, "if a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended." Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995), citing United States v. One 1987 Jeep Wrangler, 972 F.2d 472, 482 (2d Cir.

---

of the Determination and Findings.  See Minnich v. Gargano, 2001 U.S. Dist. LEXIS 372, at *18-19 (S.D.N.Y. Jan. 17, 2001).  On August 8, 2001, the Second Circuit reversed and held that Brody did not possess standing to challenge neither his lack of notice of the second July 6 hearing nor the lack of notice of the Determination and Findings.  See Brody v. Port Chester, 261 F.3d 288, 290 (2d Cir. 2001) ("Brody I").  On remand, upon a fuller evidentiary record, I once again found that Brody possessed standing to challenge his lack of notice of both the second hearing and the Determination and Findings.  See Minnich v. Gargano, 2001 U.S. Dist. Lexis 14760, at *19-20 (S.D.N.Y. Sept. 19, 2001).  On appeal to the Second Circuit, once more that court found that Brody, while he lacked standing to challenge notice of the second hearing, he did possess standing to challenge his lack of notice of the Determination and Findings.  Brody v. Port Chester, 345 F.3d 103, 109-113 (2d Cir. 2003).

[20] I also denied Defendants' motion to dismiss Brody's claims for lack of subject-matter jurisdiction pursuant to *Rooker-Feldman* doctrine.  See Brody v. Port Chester, 2007 U.S. Dist. Lexis 15746, at *16-19.  I granted Defendants' motion to dismiss Brody's equal protection claim.  See id. at *25-28.

11

1992) (summarizing Mullane and Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798-800 (1983), as "impliedly holding that actual notice satisfies demands of due process"); see also Lopes v. United States, 862 F. Supp. 1178, 1188 (S.D.N.Y. 1994) ("…[W]here there is actual notice there is no due process violation.").

Actual notice is an affirmative defense to a procedural due process claim. See Kaszuk v. Bakery & Confectionery Union & Industry International Pension Fund, 791 F.2d 548, 557 (7th Cir. 1986) (noting that district court placed burden on defendant to show "actual notice"); Gonzalez-Gonzalez v. United States, 257 F.3d 31, 39 (1st Cir. 2001) (characterizing "actual knowledge" as an affirmative defense to a procedural due process claim for lack of notice), citing United States v. One 1987 Jeep Wrangler, 972 F.2d 472, 482.[21] Accordingly, Defendants will prevail if they carry their burden and show that Brody had "actual notice."[22]

Two issues remain on remand. First, although the Second Circuit has already found that the notice of the Determination and Findings that the Village afforded to condemnees such as Brody was constitutionally inadequate, see Brody III at 124, Defendants argue that Brody nevertheless received "actual notice" of the Determination and Findings.

Secondly, Brody argues that the notice of the second public hearing on July 6 was also constitutionally inadequate. That issue is before me for the first time, as Brody previously lacked standing to bring that claim. If Brody can show that the notice of the

---

[21] As noted infra, the determinative inquiry here is "actual notice," rather than "actual knowledge." See generally Brody v. Port Chester, 2007 U.S. Dist. Lexis 16993, at *23 ("'Actual knowledge' is generally a sufficient, but not necessary, condition for a finding of 'actual notice.'"). However, notwithstanding the fact that "actual knowledge" is ultimately indicative of "actual notice," either (or both) appear to be affirmative defenses to a procedural due process claim. See id. at *26 n.17 ("[C]ourts have sometimes used the terms 'actual notice' and 'actual knowledge' nearly interchangeably."), citing United States v. One 1987 Jeep Wrangler, 972 F.2d at 482; see also Gonzalez-Gonzalez v. United States, 257 F.3d at 39 ("The government… argues… that [petitioner] had actual notice of the seizure. Building on this foundation, the government… posits that… actual knowledge of a seizure precludes a notice-based constitutional challenge…").

[22] Defendants argue that Brody bears the burden, in a § 1983 action, to prove every element of the due process claims he alleges. See, e.g., Miner v. City of Glens Falls, 999 F.2d 655, 660 (2d Cir. 1993). Defendants are correct. However, with respect to Brody's procedural due process challenge to the sufficiency of the notice of the Determination and Findings, the Second Circuit has already found that Brody has met that burden. See Brody III at 123 ("the means and content of the notice… as applied to Brody, were insufficient to satisfy due process…). The Second Circuit thus remanded Brody's claim to this Court to determine whether Brody received actual notice, see id. at 124, a determination upon which Defendants bear the burden.

July 6 hearing was constitutionally inadequate, the burden then shifts to Defendants to show Brody's "actual notice" of that hearing.

I will address each issue in turn.

### A. Brody's Actual Notice of the Determination and Findings

The Village's publication of the Determination and Findings, completed on July 22, 1999,[23] commenced the exclusive 30-day challenge period in which Brody could contest the Village's public use determination. See Brody III at 127-28. The Second Circuit held that both the means and content of the Village's notice were insufficient. Regarding the means of the notice, the Circuit held that Brody was entitled to "individualized notice by mail," which Brody was not afforded. See Brody III at 129. Regarding the content of the notice, the Circuit held that as the 30-day challenge period was the "exclusive" period to challenge the public use determination, affected property owners, such as Brody, were entitled to "some conspicuous mention of the commencement of the thirty-day challenge period." See id. at 130, 132. It is undisputed, as noted, that the Village's publication of the Determination and Findings did not mention the commencement of the thirty-day challenge period. Def. Exs. FFF, HHHH; Stipulations ¶ 23.

Brody having shown that the means, i.e. "individualized notice by mail" never happened, the burden shifts to Defendants to establish that Brody nevertheless received "actual notice" in some other way – i.e., that he received in some conspicuous fashion "mention of the commencement of the thirty-day challenge period,"[24] whether or not he

---

[23] N.Y. E.D.P.L. § 207(A) provides that a challenge must be brought "within thirty days after the condemnor's *completion* of its publication of its determination and findings pursuant to section two hundred four…" (emphasis added). Concomitantly, § 204(A) provides that the condemnor "shall publish a brief synopsis of such determination and findings in at least two successive issues of an official newspaper if there is one designated in the locality where the project will be situated and in at least two successive issues of a newspaper of general circulation in such locality." The parties stipulated to the fact that the Village published its synopsis in the *Journal News* on July 18, 21, and 22, 1999. Stipulations ¶ 22. Accordingly, without greater knowledge of the circulation patterns of Port Chester-area local newspapers, I will presume that publication completed on July 22. (Ultimately, this factual issue is not dispositive to my decision.)

[24] See Brody v. Port Chester, 2007 U.S. Dist. Lexis 16993, at *22 n.15, citing Dusenbery v. United States, 534 U.S. 161, 170 n.5 (distinguishing between "actual notice" and "notice by mail").

Additionally, as noted in my Opinion of March 12, 2007, the parties do not appear to dispute that Brody's "actual notice" must be equivalent to constitutionally sufficient notice for due process to be satisfied. See Brody v. Port Chester, 2007 U.S. Dist. Lexis 16993, at *27.

13

understood it.[25]  In layman's terms, the relevant question is whether Brody received notice that his "clock" to challenge the "public use" determination had started ticking, and how long it would tick for.

Defendants first argue that Brody's lawyer Garrison Corwin's review of the Draft EIS and Final EIS, which contained (partially incorrect) summations of the EDPL challenge procedures, established "actual notice" to Brody.  Even assuming *arguendo* that Corwin passed along that knowledge to Brody[26] – or, failing that, that Corwin's knowledge could generally be imputed to his client Brody through agency principles[27] – Corwin never learned of the "commencement" of the thirty-day challenge period.  Indeed, Corwin's representation of Brody concluded long before the "commencement" of the 30-day period began.  Although Corwin reviewed relevant sections of the law regarding the challenge procedures, advance knowledge of the law is no substitute for constitutionally sufficient notice, which here includes "commencement" of the thirty-day challenge period.  See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 318 (1950) (provision of relevant statute to beneficiaries in advance does not suffice to provide notice of "steps… taken affecting [beneficiaries'] interests.").

It appears clear that subsequent to Corwin's representation, Brody did not receive "actual notice" that his "clock was ticking" up to, including, and immediately after the Village's publication of the Determination and Findings.  Brody was not told at the June 7, 1999 public hearing that a Determination and Findings would be issued (nor that it was imminent), nor that a 30-day challenge period would follow its issuance.  Brody could not have learned of the 30-day challenge period from the Village's published synopsis of the Determination and Findings, even had he seen the synopsis, as that synopsis did not mention it.  Brody could not have learned of the commencement of the 30-day challenge

---

[25] See note 21, supra.

[26] As noted above, Corwin testified that he did not discuss the issue of the EDPL challenge procedures with Brody.

[27] Brody argues that Corwin's knowledge of condemnation law or proceedings, if any, cannot be imputed to him, because condemnation law was outside the scope of Corwin's representation of Brody regarding the environmental impact statement.  Cf. Edwards v. Duane, Morris & Heckscher LLP, 2004 U.S. Dist. LEXIS 24177, at *25-27 (E.D. Pa. 2004) (Court declined to impute bankruptcy attorney's knowledge of letter regarding separate litigation to client).  Because, in any event, Corwin's knowledge does not establish "actual notice" of the commencement of the thirty-day challenge period, it is unnecessary to reach the issue.

period from published news accounts, even had he read them, as no news accounts mentioned it.

Defendants' best argument that Brody received actual notice of the commencement of the 30-day challenge period is Brody's conversation with Stanley Perelman that occurred in late July or early August 1999. Perelman told Brody that "G&S had received all its approvals" on July 14, 1999, and that the "appeals period" had not expired. Perelman Decl. ¶ 33. Perelman did not, however, specifically tell Brody that the Determination and Findings relating to public use was published; indeed, Perelman averred that he was "generally talking about all the appeals… not just condemnation." Tr. 115:3-4. Perelman also did not specifically tell Brody that the publication of the Determination and Findings signaled the commencement of a 30-day period within which a challenge had to be brought.

Constitutionally sufficient notice requires "some conspicuous mention of the commencement of the thirty-day challenge period." Brody III at 130. Although Perelman arguably informed Brody of the "commencement" of some sort of challenge period generally, Perelman did not do so with such specificity to constitute "conspicuous" mention of the relevant challenge period relating to public use. Additionally, if Perelman informed Brody of the "commencement" of the challenge period, he did so approximately two to three weeks after that commencement.[28] Even assuming *arguendo* that Perelman informed Brody of the commencement of the challenge period for public use, Perelman did not inform Brody that the challenge period

---

[28] As noted in my March 12, 2007 Opinion, the "right to notice and an opportunity to be heard must be granted at a meaningful time…" Brody v. Port Chester, 2007 U.S. Dist. Lexis 16993, at *30 n.20, citing Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004), citing, e.g., Mullane, 339 U.S. 306, 313; Fuentes v. Shevin, 407 U.S. 67, 80 (1972).

Brody's 30-day challenge period began on July 22, 1999, and ended on Monday, August 23, 1999 (the Monday after the 30th day). Here, it is unclear when exactly Perelman held this conversation with Brody, although the balance of evidence suggests that it was held in the last week of July or the first week of August. Assuming *arguendo* that Perelman provided Brody with constitutionally sufficient notice during their conversation, Brody would have had approximately 17 to 24 days to take action. It appears that such notice may, in some circumstances, be temporally sufficient to constitute "actual notice." See Anderson v. Davila, 125 F.3d 148, 157 (3rd Cir. 1997) (where Government's attorneys had actual notice of complaint two weeks before preliminary injunction hearing, under Fed. R. Civ. P. 6(d), "[those] two weeks provided the defendants with a fair opportunity to prepare to explain their actions to the district court."), citing Fuentes v. Shevin, 407 U.S. at 80. (That said, Brody is not an attorney.)

In any event, because I find that Defendants have not met their burden to show that Perelman's conversation provided Brody with "actual notice" of the commencement of the thirty-day challenge period, it is unnecessary to reach the issue of the timing of the conversation.

15

was "thirty days" – an element of notice that the Second Circuit held to be constitutionally required.[29] In sum, Perelman's conversation does not satisfy Defendants' burden to show "actual notice" of constitutionally sufficient notice as articulated by the Second Circuit.

Additionally, Defendants have not met their burden to show that Brody received "actual notice" by showing evidence of Brody's actual knowledge such that would establish Brody's actual notice. Brody testified that he did not know of the Determination and Findings, nor that their publication commenced a thirty-day challenge period.[30] Brody Decl. ¶¶ 32-35. Defendants generally aver that knowledge of the approval of the redevelopment project was high in the community. See, e.g., Tr. 145:12-17 (Perelman: "It was a well-publicized event, these approvals…" Court: "The 30-day period was not, apparently…" Perelman: "I think everybody was aware of that."). However, Defendants provide no specific information to rebut Brody's averments that he did not know of the publication of the Determination and Findings, nor that its publication commenced a 30-day challenge period.[31] Nor, for that matter, while admittedly Brody's testimony was sometimes hard for me to swallow, did Defendants produce or uncover on cross evidence to impugn Brody's credibility on this issue.

In short, Defendants have not met their burden to establish that Brody received "actual notice" of the publication of the Determination and Findings, and consequent commencement of the thirty-day challenge period, such that would obviate the Village's failure to provide constitutionally sufficient notice. Brody has thus established a constitutional violation on the part of the Village as to the form and content of his notice of the publication of the Determination and Findings.

---

[29] As noted, according to Perelman, Brody himself asked Perelman whether the appeals period expired. It may be, as Defendants aver, that even if Perelman provided Brody with constitutionally sufficient notice, Brody "didn't want to fight" and would not have challenged the Village's public use determination. Such arguments will be considered as part of my determination of Brody's damages.

[30] Brody's averments of his lack of knowledge are supported by the statements of area businessman Joan Bischoff van Heemskeerck, who testified that although he generally kept abreast of the project and attended public hearings, he "had no idea about there being some kind of 30 day period to do something." See Bischoff Decl. ¶¶ 9-12, 22.

[31] Brody's statements that he did not read newspapers at the time, despite his present averments that he was exceedingly interested in fighting the project, are admittedly self-serving. In any event, taking into account the parties' conflicting testimony as to what Brody would have done had he received notice, it will be Brody's burden to establish damages in subsequent proceedings before this Court.

Brody's damages will be determined in a subsequent proceeding in accordance with this Opinion, see infra.[32]

### B. Brody's Actual Notice of July 6 Hearing

Brody also argues that the Village's notice of the second public hearing on July 6 was constitutionally inadequate, both in form and in content.

Regarding Brody's challenge to the form of the notice, it is undisputed that Brody was not mailed notice of the July 6 hearing. "Notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." Brody III at 127, citing Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962). Defendants have proffered little evidence to rebut Brody's averments that he did not receive actual notice of the July 6 hearing. Accordingly, Brody's due process right to notice of that hearing was violated.[33]

Regarding Brody's challenge to the content of the notice, the calculus is slightly different. The second public hearing did not trigger a deprivation of Brody's property, as did the publication of the Determination and Findings; rather, the second public hearing provided an opportunity for affected property owners to further provide their comments on public use to the Village, before the Village made its Determination and Findings. The notice stated that the Village would hold a "public hearing… to review the public use to be served" by the Project. Pl. Ex. 12. The notice further stated that the hearing would "review the impacts on residents which may result from the condemnation by the Village of private properties within the project area," and listed the affected properties (including Brody's). Id. Such notice, if mailed to property owners, is sufficient to provide "as much notice as is practicable to inform a condemnee of legal proceedings against his property," see Brody III at 130, citing Mullane, 339 U.S. at 315 – at least, the legal proceedings that

---

[32] Defendants note correctly that Brody bears the burden to show his damages. See Miner v. City of Glens Falls, 999 F.2d at 660.

[33] It bears mentioning that as the Village mailed personal notice to Brody of the first public hearing, and as New York state has now amended the EDPL to require personal notice to affected property owners of any hearing on public use, it appears that personal notice to Brody of this hearing was practicable. See Brody III at 129 (noting that EDPL now requires individualized notice by mail, and stating that "while this change does not inform our decision as to the minimum due process requirements, it does confirm that such notice is practicable under the circumstances.").

17

were underway at that time.[34] Beyond that, property owners remain "generally charged with knowledge of the laws relating to property ownership." Brody III at 132, citing North Laramie Land Co. v. Hoffman, 268 U.S. 276, 283 (1925).

Brody thus has stated a procedural due process violation for the form of his notice of the July 6 hearing. It bears mentioning, however, that at this stage, the harm that befell Brody by his lack of notice of this hearing appears fairly speculative. Unlike the issuance of the Determination and Findings, no deprivation of Brody's property was triggered by the July 6 hearing. Brody's averments of the actions he would have taken had he received notice of the hearing are vague. Moreover, the comments Brody made at the first public hearing were included in the record of the second public hearing, undercutting Brody's claim for damages resulting from the loss of his opportunity to be heard. Still, I will reserve decision on Brody's resultant damages until after both parties have had an opportunity to present evidence on the issue.

### III. CONCLUSION

Brody has met his burden to show a procedural due process violation on the part of the Village for a) lack of notice, both in form and in content, of the Village's publication of the Determination and Findings, and b) lack of notice, in form, of the July 6, 1999 "public use" hearing.

The parties may, if they so choose, conduct additional discovery regarding damages, to be concluded by September 15, 2007. Any remaining discovery motions must be submitted fully briefed within 10 days from the date hereof. Any dispositive motion as to damages shall be submitted fully briefed by October 31, 2007. Trial of damages, if necessary, will commence in the month of December 2007.

**THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT.**

New York, New York
July 14, 2007

_____
United States District Judge

---

[34] If and when, following that hearing, a village issues its Determination and Findings and triggers property owners' 30-day challenge period, that issuance of a Determination and Findings requires separate notice, in accordance with this Court's and the Second Circuit's opinions.